# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**

**VAUCHON K. COLEMAN**                    **NO.: 3:13-cr-00136-BAJ-SCR**

## RULING AND ORDER

Before the Court is Defendant Vachon Coleman's ("Coleman") **MOTION TO SUPPRESS EVIDENCE (Doc. 17),** seeking "to suppress evidence contained in Count One and Count Two of the Indictment, including all contraband, guns, statements and other items seized from him at the time of his arrest, on grounds that the evidence was acquired by the government from a warrantless search and seizure," (*id.* at p. 1). The Government has filed a memorandum in opposition to Coleman's request, (Doc. 20), and the Court held an evidentiary hearing on the Motion on May 13, 2014, (Doc. 22). For reasons explained below, Coleman's Motion will be denied.

## I.     BACKGROUND

Coleman is charged with one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1), and one count of possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1). (Doc. 1 at p. 1). Each charge stems from Coleman's July 8, 2013 late-evening encounter with officers of the Baton Rouge Police Department at a convenience store in Baton Rouge, Louisiana. In short, police officers found the gun and drugs that led to the charges

against Coleman when they subdued him, following Coleman's attempt to flee. After Coleman was arrested and *Mirandized*,[1] he made inculpatory statements indicating that the gun and drugs were his.

The question raised by Coleman's motion is whether the gun, drugs, and statement must be suppressed because they resulted from an illegal seizure. Coleman argues that each piece of evidence must be suppressed because he was "seized" without reasonable suspicion *or* probable cause *at moment of his first encounter with police*; thus any subsequent search and/or arrest was tainted by this initial illegality. (*See* Doc. 17 at pp. 4–8). The Government disagrees, contending that "[Coleman's] motion lacks merit and should be denied." (Doc. 20 at p. 1). Specifically, the Government asserts that at the point of *initial* contact with Coleman, the police officers did *not* suspect him of a crime—indeed the officers were merely attempting to talk to him—and that it was only *after* the officers attempted to make contact that Coleman's actions created reasonable suspicion *and* probable cause to believe that he was engaged in criminal activity. (*See id.* at pp. 5–10).

## II.    FINDINGS OF FACT

Neither Coleman nor the Government submitted any evidence to support their respective versions of the circumstances surrounding Coleman's arrest. Thus, on May 13, 2014 the Court held a hearing on the matter. At that hearing, the Government presented the testimony of Sgt. Troy Lawrence, the arresting officer;

---

[1]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

Coleman presented the testimony of Dedrick Washington and Patricia Coleman, each witnesses to certain events surrounding Coleman's arrest.

### a. Uncontested Testimony

In broad strokes, the witnesses' testimony was complimentary. Indeed, each side agrees that shortly before 11:00 p.m. on July 8, 2013, Sgt. Lawrence and his partner, Officer Jason Dohm, confronted Coleman in the Scotlandville Convenience Store ("Convenience Store") parking lot. (Evidentiary Hearing, May 13, 2014 (hereinafter "Hearing") (Testimony of Sgt. Lawrence); Hearing (Testimony of Dedrick Washington)). Coleman attempted to flee, but was quickly apprehended after Sgt. Lawrence deployed his Taser against him. (Hearing (Testimony of Sgt. Lawrence); Hearing (Testimony of Dedrick Washington)). When Sgt. Lawrence tased Coleman, Coleman fell to the ground, exposing a handgun. (Hearing (Testimony of Sgt. Lawrence)). Lawrence detained Coleman, handcuffed him, informed him of his *Miranda* rights, and then asked if Coleman had "anything else on him." (*Id.*). Coleman responded that he had half an ounce of marijuana in his pants, which Sgt. Lawrence then recovered. (*Id.*). Coleman further stated that he "f****d up," and that he was "only carrying a firearm because the area was bad." (*Id.*).

This much is uncontroverted. As is often the case, however, the devil is in the details. The key factual dispute is the series of events *from* when Sgt. Lawrence and Officer Dohm exited their cruiser to confront Coleman, *to* when Sgt. Lawrence

3

apprehended Coleman in the ditch across the street from the Convenience Store. Dispositive nontestimonial evidence on this issue was not introduced at the hearing. Sgt. Lawrence's testimony on this issue, while not completely incompatible with Mr. Washington's testimony, presented a contrasting account in key respects.[2] Accordingly, the Court must decide which version of events to believe.

### b. *Sgt. Lawrence's account of the events leading to Coleman's arrest*

Sgt. Lawrence testified that during the late evening hours of July 8, 2013, he was patrolling the area around the Convenience Store in an unmarked, green Chrysler 300 sedan. (Hearing, (Testimony of Sgt. Troy Lawrence)). Sgt. Lawrence's partner, Assisting Officer Jason Dohm, was driving; Sgt. Lawrence was riding in the front-passenger seat. (*Id.*). Although their cruiser was unmarked, the officers were wearing their police uniforms. (*Id.*).

The Convenience Store is located in the 1300-block of Rosenwald Road in Baton Rouge, at the northwest corner of Rosenwald Road and Southern Avenue. At approximately 10:50 p.m., the officers approached the Convenience Store from the east, proceeding westbound on Rosenwald Road. (*Id.*). As they crossed the railroad tracks that run parallel with Southern Avenue, Sgt. Lawrence observed an individual—later determined to be Coleman—leaning into the front, passenger-side window of a pickup truck parked in the Convenience Store parking lot. (*Id.*). Sgt.

---

[2] Patricia Coleman did not observe the events leading up to Coleman's arrest; she only observed certain events following Coleman's arrest. (Hearing (Testimony of Patricia Coleman)). Thus, the Court finds that Ms. Coleman's testimony is not relevant to the issue of whether the evidence recovered from Coleman must be suppressed.

Lawrence stated that when he first observed Coleman, Coleman was *not* engaged in any suspicious behavior. (*Id.*). Rather, Coleman appeared to be talking to individuals sitting in the pickup. (*Id.*). However, because the Convenience Store was located in a known high-crime area, and because the Convenience Store's owner had previously requested that Sgt. Lawrence enforce the Convenience Store's posted no loitering policy, the officers decided to stop and talk to Coleman, and, if necessary, ask him and the individuals in the truck to move on from the parking lot. (*Id.*). Sgt. Lawrence testified that there was nothing unusual in this course of action; indeed, Lawrence stated that as part of his regular rounds with the Baton Rouge Area Violence Elimination (BRAVE) task force, he stops and explains the Convenience Store's loitering policy to, on average, 200 people each month. (*Id.*). Sgt. Lawrence further stated that, invariably, people leave the Convenience Store property when asked to do so, and that he has never issued a citation, much less made an arrest, to enforce the Convenience Store's loitering policy. (*Id.*).

Sgt. Lawrence testified that the Convenience Store parking lot is well-lit, and that he had a clear view of Coleman from the time he and Officer Dohm crossed the railroad tracks, to when they parked the unmarked Chrysler on the side of Rosenwald Road, a period of about "5 to 8 seconds." (*Id.*). At no point during this brief span did Coleman's behavior suggest that he was engaged in illegal activity. (*Id.*). Sgt. Lawrence recalled that Officer Dohm parked the Chrysler at the northwest corner of Rosenwald Road and Southern Avenue, at a distance of

5

approximately eight to ten yards from Coleman and the pickup. (*Id.*). Sgt. Lawrence testified that when he got out of the Chrysler, he was close enough to talk to Coleman had he "yelled," but that he "wanted to remain professional." (*Id.*). Accordingly, without calling out first, Sgt. Lawrence closed the car door, and began walking towards Coleman. (*Id.*).

At the sound of the Chrysler's door closing, Coleman turned to face the approaching officers. (*Id.*). Sgt. Lawrence made eye contact with Coleman, and then observed Coleman's right hand adjusting a chrome colored gun with a black handle. (*Id.*). The gun was tucked into Coleman's waistband, and it appeared to Sgt. Lawrence that Coleman was trying to conceal it. (*Id.*). At that time, Sgt. Lawrence drew his Taser and ordered Coleman to remove his hands from his waist. (*Id.*). Immediately thereafter, Coleman attempted to flee on foot. (*Id.*). Lawrence yelled "Stop! Taser! Taser!" (*Id.*). Coleman failed to stop, and Lawrence fired two Taser probes, missing Coleman with the first, and hitting him with the second. (*Id.*). Coleman fell to the ground in the ditch across Rosenwald Road from the Convenience Store, causing the gun to dislodge from his waistband and fall at his right side. (*Id.*). Sgt. Lawrence then apprehended and arrested Coleman, collecting the gun, the marijuana, and Coleman's statement(s) in the process. (*Id.*).

   c. *Mr. Washington's account of the events leading to Coleman's arrest*

Mr. Washington presented a slightly divergent account of the initial encounter between Sgt. Lawrence and Coleman. Washington testified that on the

evening of July 8, he and a friend were sitting in a pickup truck, parked in the Convenience Store parking lot. (Hearing (Dedrick Washington Testimony)). The truck was parked in front of the "ice cooler"—in other words, to the right of the Convenience Store's front door, in the parking space nearest the corner of Rosenwald Road and Southern Avenue. (*Id.*; *see also* Government Exhibit 1; Defense Exhibit 1). At some point, Coleman—a neighborhood acquaintance of Mr. Washington—approached the pickup and struck up a conversation through the truck's open passenger-side window. (Hearing (Dedrick Washington Testimony)). Mr. Washington recalled Coleman having a cell phone in his hand, but Washington did not see Coleman with a gun. (*Id.*).

Mr. Washington testified that after about five minutes of conversation with Coleman, he looked in the "rearview" and observed a teal green Chrysler 300 sedan pull up immediately behind the truck, blocking the pickup into the parking space. (*Id.*). Two officers "hopped out" of the Chrysler with "weapons"[3] drawn; Mr. Washington heard one of the officers say, "Let me see some hands." (*Id.*). At this point, Coleman "took off running." (*Id.*).

Mr. Washington stated that he did not know where Mr. Coleman ran to because he was distracted by the second police officer—presumably Officer Dohm— who questioned him and his friend regarding whether they had drugs or guns in the truck. (*Id.*). According to Mr. Washington, this officer then handcuffed Washington

---

[3] Mr. Washington stated that now he knows that the "weapons" he saw were Tasers; at the time, however, he only recognized them as "weapons." (Hearing (Testimony of Dedrick Washington)).

and his friend together where they sat, frisked them, and searched the truck. (*Id.*).

After about five minutes, having failed to find any contraband, the officer un-

handcuffed Washington and his friend, and allowed them to drive away. (*Id.*). Mr.

Washington testified that he did not remember how his friend (the driver) managed

to get the truck out of the parking lot with the Chrysler blocking its path. (*Id.*).

Washington also stated that when he and his friend drove away, Coleman was still

at the scene. (*Id.*).

> d. *Reconciling Sgt. Lawrence's and Mr. Washington's accounts*

To the extent that Sgt. Lawrence's and Mr. Washington's versions of events

are in conflict, the Court accepts Sgt. Lawrence's account. Specifically, the Court

finds: (1) the police officers did *not* block-in the pickup, but rather parked the

Chrysler at a short distance from the truck in which Mr. Washington was sitting;

and (2) the officers drew their Tasers and commanded Coleman to raise his hands

only *after* Sgt. Lawrence observed Coleman adjusting the gun at his waistband.

This conclusion was reached primarily from listening to, and analyzing the

witnesses' hearing testimony.

Every aspect of Sgt. Lawrence's testimony was credible. His version of events

was internally consistent, and he answered questions directly and without

hesitation. Sgt. Lawrence's version of events is simply more plausible than Mr.

Washington's.

Although credible at other times, Mr. Washington's testimony was not believable on *the* key issues of: (1) *where* Officer Dohm parked the Chrysler, and (2) *when* the officers drew their Tasers and ordered Coleman to raise his hands. For example, if true that Officer Dohm blocked the pickup with the unmarked Chrysler, the officers would also have had to move the Chrysler before Washington and his friend could drive away from the scene. Yet Mr. Washington could not recall how they exited the parking lot. Further, based on Sgt. Lawrence's testimony that the officers did *not* see Coleman engaged in any suspicious activity *prior* to getting out of the Chrysler, and only stopped to ask that the parties comply with the Convenience Store's loitering policy—which the Court credits as true—it would make little sense for the officers to park directly behind the pickup, blocking it in, particularly when, in Sgt. Lawrence's experience, people comply with requests to leave without hassle.

Finally, the Court rejects Mr. Washington's recollection that the officers emerged from the Chrysler shouting, with their weapons drawn, noting: (1) Washington was talking to Coleman when the officers arrived at the Convenience Store and, thus, he was distracted; and (2) Washington's view of the Chrysler was obstructed because Coleman was standing at his window. Precisely because Washington was distracted, and lacked a clear view at the moment the officers got out of the Chrysler, the Court cannot credit his account of the rapid sequence of

events between when the officers arrived, and when Sgt. Lawrence subdued Coleman with his Taser.

## III.    DISCUSSION

Coleman asserts that he was illegally seized at the moment the officers "exited their car and began approaching him." (Doc. 17 at p. 4). Thus, "all contraband, guns, statements and other items seized from him at the time of his arrest" must be suppressed. (*Id.* at p. 1).

The constitutional framework for assessing the merits of Coleman's Motion to Suppress is well-established. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Fourth Amendment's protections are effectuated by the "exclusionary rule," which simply states that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *See United States v. Calandra*, 414 U.S. 338, 347 (1974). "This prohibition applies as well to the fruits of the illegally seized evidence." *Id.*

Of course, the Fourth Amendment's protection against searches and seizures is *not* absolute. The U.S. Supreme Court has consistently emphasized that "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quotation marks omitted).

Indeed, "[t]he touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (quotation marks omitted).

In situations involving police-citizen encounters, the Supreme Court has established a three-tier framework for determining when a "seizure" has occurred. *United States v. Hanson*, 801 F.2d 757, 761 (5th Cir. 1986).

> On the first level is mere communication between a citizen and an officer, involving no element of detention or coercion. Such contact does not implicate the fourth amendment. On the second level are brief detentions or investigatory stops which must be supported by "reasonable suspicion" on the part of the detaining officer based on "specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant an intrusion." Full scale arrests occupy the third tier, involving the types of restrictions on liberty imposed by formal custody. Under the fourth amendment, an arrest cannot be conducted in the absence of probable cause.

*Id.* (citations omitted). Depending on the circumstances, police-citizen encounters that begin at one tier, requiring a certain level of Fourth Amendment scrutiny, may quickly escalate into another tier, requiring a different level of scrutiny. *Cf. United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010) ("If officers gain new information relevant to safety or criminal conduct, the scope of their permissible investigation may expand. For example, reasonable suspicion may 'ripen' or 'develop' into probable cause for an arrest if a *Terry* stop reveals further evidence of criminal conduct."); *United States v. Hernandez*, 825 F.2d 846, 852 (5th Cir. 1987) ("This Court has stated that the events leading up to the arrest may occur in such close sequence that it is immaterial that the arrest occurred later in time than the search incident to that arrest." (quotation marks and alterations omitted)).

11

Undoubtedly, Coleman was seized at some point during his July 8 encounter with Sgt. Lawrence and Officer Dohm. Likewise, it is without question that Coleman was seized at some point *prior* to his formal arrest. Thus, to determine whether any or all of the evidence against Coleman must be suppressed, the Court must answer two questions: (1) at what point during his July 8 encounter with the officers was Coleman "seized" within the meaning of the Fourth Amendment; and (2) were the officers justified in detaining Coleman at that point—*i.e.* was Coleman's seizure reasonable. *See Hanson*, 801 F.2d at 761 ("This three-tiered approach presents this court with two questions: when were the defendants 'seized' within the meaning of the fourth amendment and which tier does that seizure occupy?").

Based on the testimony at the hearing, and the Court's findings of fact, *supra*, the Court has little trouble determining that the officers' *initial* attempt to confront Coleman was *not* a "seizure," or a "detention," within the meaning of the Fourth Amendment. Sgt. Lawrence stated repeatedly that at the time he and Officer Dohm approached Coleman, they had no reason to believe that Coleman was engaged in criminal activity. Instead, the officers sought to speak with Coleman and the occupants of the pickup truck regarding the Convenience Store's loitering policy. The officers' initial approach "involv[ed] no element of detention or coercion"; accordingly this "contact"—if, indeed, it can be called that—"does not implicate the fourth amendment." *Hanson*, 801 F.2d at 761; *see also Florida v.*

12

*Royer*, 460 U.S. 491, 497 (1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [and/or] by putting questions to him if the person is willing to listen . . . . .").

The situation changed when Sgt. Lawrence drew his Taser on Coleman, and ordered him to remove his hands from his waist. At this point, Coleman was "seized" within the meaning of the Fourth Amendment because "consider[ing] all the circumstances surrounding the encounter"—which include (1) the officers' uniforms and (2) proximity, and (3) Sgt. Lawrence's overt show of authority—"the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *see United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (finding that the defendant had been "arrested or seized" when "[t]he first words spoken by the police officer who had his gun drawn was a command for [the defendant] to get face down on the ground and then, without further inquiry, [the defendant] was handcuffed").

However, this initial seizure was reasonable because before it occurred, Sgt. Lawrence observed Coleman adjusting a gun in his waistband. Considering (1) the high-crime area in which the Convenience Store is located; (2) the late hour at which the officers encountered Coleman; and (3) Sgt. Lawrence's observation that Coleman was handling a gun, Sgt. Lawrence quite clearly had "a particularized and

13

objective basis for suspecting [Coleman] of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). Accordingly, Sgt. Lawrence was justified in detaining Coleman for the purpose of neutralizing the threat posed by the gun in Coleman's waistband, *regardless* of whether, at that moment, Sgt. Lawrence had *probable cause* to arrest Coleman for a crime. *See Terry*, 392 U.S. at 27 ("[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.").

Finally, the Court determines that Coleman's warrantless arrest was justified by probable cause. This is because rather than submit to Sgt. Lawrence's command to raise his hands, Coleman: (1) attempted to flee by running away; (2) persisted in his attempt to flee even after Sgt. Lawrence yelled "Stop! Taser! Taser!" *and* fired a Taser probe that missed; and (3) dropped the handgun at his side when he fell to the ground after being hit by the Taser probe. These additional "facts and circumstances" are more than "sufficient for a reasonable person to conclude that [Coleman] had committed or was committing an offense" when he was arrested. *United States v. Wadley*, 59 F.3d 510, 512 (5th Cir. 1995); *see also id.* at 512–13 ("[I]n combination with other facts and circumstances, flight from an officer may create probable cause where the defendant persistently attempts to evade capture.").

14

In sum, the Court determines: (1) the officers' initial attempt to confront Coleman did not implicate the Fourth Amendment; (2) Coleman's initial detention was justified by reasonable suspicion upon Sgt. Lawrence's observation of the gun at Coleman's waistband; and (3) Coleman's arrest was justified by probable cause when, on top of everything else, Coleman persisted in his attempt to flee from the officers. *See Hanson*, 801 F.2d at 761. Thus, the officers' actions were reasonable within the meaning of the Fourth Amendment, and the evidence against Coleman need not be suppressed as the result of an illegal seizure and/or search. *See Calandra*, 414 U.S. at 347.

## IV. CONCLUSION

**IT IS ORDERED** that Defendant's **MOTION TO SUPPRESS (Doc. 17)** is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's trial is set for **June 18, 2014.**

Baton Rouge, Louisiana, this 23rd day of May, 2014.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

15